AMERICAN SAFETY EQUIPMENT
CORPORATION, a New York
corporation, Petitioner,

v.

Donald WINKLER, Respondent.

No. 79SC352.

Supreme Court of Colorado,
En Banc.

Jan. 18, 1982.

Tilly & Graves, John W. Grund, Denver,
for petitioner.

Holm & Dill, Kim H. Peterson, Denver,
for respondent.

ERICKSON, Justice.

We granted certiorari to review the decision of the court of appeals in *Winkler v. American Safety Equipment Corporation*, 43 Colo.App. 241, 604 P.2d 693 (1979). In

*Winkler*, the court of appeals expressly adopted the doctrine of strict liability for misrepresentation of a product under section 402B of the Restatement (Second) of Torts, and concluded that the trial court had erred in refusing to instruct the jury on a claim for relief under section 402B. The court of appeals ordered a new trial. For the reasons set forth in this opinion, we reverse and remand to the court of appeals with directions to reinstate the judgment entered in favor of American Safety Equipment Corporation by the district court.

## I.

Petitioner, American Safety Equipment Corporation (American), is the designer and manufacturer of a wide variety of protective headgear. One type of helmet manufactured by American is a model # 1601 "general duty" helmet which was designed at the request of police agencies for exclusive police use. It was not designed or intended for use by police officers assigned to motorcycles. The model # 1601 helmet is designed with a special snap harness arrangement which permits quick release and easy removal to protect police officers in riot and crowd control situations. The quick snap release design of the chin strap prevents a police officer from being maneuvered or injured by someone pulling on his model # 1601 helmet. American also designs and manufactures a model # 1602 helmet for police officers using motorcycles. The model # 1602 helmet uses a D-ring harness arrangement which is not designed for quick release. Both models are packaged in the same type of box. The exterior of the box has artist illustrations of some of the uses of American's headgear, including illustrations of a motorcyclist wearing a helmet. The distinctive uses of both helmets, however, are indicated in American's brochures, which are distributed with the helmets upon delivery to the police departments. Neither model is sold to the general public.

The Denver Police Department purchased both types of helmets from American, and issued model # 1601 for general duty purposes and model # 1602 for use by motorcycle officers. In order that the two models could be readily distinguished, the model # 1601 helmets were painted blue and the model # 1602 helmets were painted white. In 1974, the Denver Police Department adopted a policy of giving the used, cosmetically-damaged, model # 1601 helmets to Denver police officers for their personal use. Under the giveaway program, the helmets were placed in a discard bin in the warehouse of the Denver Police Department, from which officers could select a helmet. According to the record, the chief supply officer at the Denver Police Department testified that he knew that the helmets would be used privately as motorcycle helmets. At no time, however, was American informed of the giveaway program.

The respondent, Donald Winkler, was a Denver police officer. Upon graduation from the police academy in 1971, he was issued a new model # 1601 helmet for general duty purposes, which was packaged in its original box. Early in 1975, after buying a motorcycle for recreational dirt bike riding, Winkler selected a used model # 1601 helmet from the discard bin at the Denver Police Department warehouse. Winkler did not receive a box when he selected the model # 1601 helmet from the discard bin.

On July 19, 1975, while off duty, Winkler was seriously injured when his motorcycle collided with a pickup truck. At the time of the accident, Winkler was wearing the used model # 1601 helmet he had obtained from the discard bin. When he collided with the truck, Winkler was thrown several feet into the air and, before he hit the ground, his helmet came off his head. Winkler suffered severe head injuries as a result of the accident.

On November 3, 1976, Winkler filed suit for damages against American. Winkler's complaint asserted four claims for relief: (1) strict liability for the manufacture of a defective product under section 402A of the Restatement (Second) of Torts (section 402A); (2) negligent manufacture of a product; (3) *res ipsa loquitur*; and (4)

strict liability for misrepresentation of a product under section 402B of the Restatement (Second) of Torts (section 402B). The claims for negligence and *res ipsa loquitur* were dismissed prior to trial. Winkler's claim for damages under section 402B was predicated on the following theory. Both model # 1601 and model # 1602 helmets are packaged in the same type of box, which has two artist illustrations depicting a motorcyclist wearing a helmet. Although Winkler did not receive a box with the model # 1601 helmet he was wearing at the time of the accident, he claimed to have used the helmet as a motorcycle helmet because of his reliance on the illustrations on the box he received with the model # 1601 helmet that was issued to him by the Denver Police Department in 1971.

At trial, Winkler tendered jury instructions relating to two claims of strict liability: (1) misrepresentation of a product under section 402B; and (2) manufacture of a defective product under section 402A. Further, because Winkler claimed recovery on two theories of strict liability, he tendered a proximate cause instruction which would have permitted the jury to consider concurrent causes in its determination of whether proximate cause existed. The trial judge refused to instruct the jury on Winkler's strict liability claim for misrepresentation of a product under section 402B, and limited instructions to the jury regarding proximate cause to strict liability arising out of the manufacture or design of a defective product (section 402A).

The case was then submitted to the jury on Winkler's claim of strict liability for the manufacture of a defective product under section 402A. On November 28, 1977, the jury returned a verdict in favor of American, and judgment was entered accordingly.

Thereafter, Winkler filed a motion for a new trial which alleged, in pertinent part: (1) that the trial court's failure to instruct the jury regarding the strict liability claim for misrepresentation of a product under section 402B constituted error; and (2) that the instruction given to the jury on proximate cause was improper. The trial court denied Winkler's motion, and Winkler appealed to the court of appeals.

The court of appeals reversed the judgment of the trial court, and concluded that the trial court erred in refusing to instruct the jury on Winkler's section 402B claim. The court also concluded that, because the jury could have found that more than one cause was operative at the time of injury, the trial court failed to properly instruct the jury regarding proximate cause. In its decision, the court of appeals expressly adopted, for the first time in Colorado, the doctrine of strict liability for misrepresentation of a product under section 402B. *Winkler v. American Safety Equipment Corporation*, 43 Colo.App. 241, 604 P.2d 693 (1979).

II.

We first address the court of appeal's express adoption of section 402B for products liability actions in Colorado. We find section 402B to be applicable under the facts of this case.

A.

The imposition of strict liability in products liability cases is not foreign to Colorado. In *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975), we expressly adopted the doctrine of strict liability in tort under section 402A of the Restatement (Second) of Torts.[1] However, while the

1. Section 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

strict liability action under section 402B is a corollary of the strict tort liability doctrine articulated in section 402A, it represents a unique and totally distinct cause of action. Section 402A imposes liability on the supplier or manufacturer of a defective product which is unreasonably dangerous for its intended or reasonably foreseeable uses to the user or consumer. *See, e.g., Union Supply v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978); *Bradford v. Bendix-Westinghouse Automotive Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973). In contrast, the representational theory of section 402B requires neither a defective product nor one that is unreasonably dangerous. Sales, *The Innocent Misrepresentation Doctrine: Strict Tort Liability Under Section 402B*, 16 Houston L.Rev. 239 (1979). Rather, the rule stated in section 402B stems from the concept of express warranty by advertising. *See Restatement (Second) Torts* § 402B, Comment d, at 360 (1965); 2A *L. Frumer & M. Friedman, Products Liability* 3C–2 (1981). Section 402B provides:

> "One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though
>
> (a) it is not made fraudulently or negligently, and
>
> (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller."

Section 402B, therefore, permits an action in strict liability for physical harm to the consumer, resulting from a misrepresentation to the public of the character or quality of the chattel sold, even though the misrepresentation is an innocent one and is not made fraudulently or negligently.

**B.**

The theory of recovery for misrepresentation in section 402B presents an unconventional hybrid between contract and tort law. At common law, an action grounded on breach of warranty sounded in tort rather than in contract. *Hansen v. Firestone Tire & Rubber Co.*, 276 F.2d 254 (6th Cir. 1960). *See generally* Sales, *supra*, at 241. Characterizing the action as trespass on the case, the English courts permitted recovery for the breach of an express warranty of a material fact, relied upon in the purchase of a chattel, that later proved to be false. *See, e.g., Medina v. Stoughton*, 1 Lord Raym. 593, 91 Eng.Rep. 1297 (K.B.1700); *Cross v. Garnet*, 3 Mod. 261, 87 Eng.Rep. 172 (K.B.1689).

By the end of the eighteenth century, however, the tort character of an express warranty action had disappeared in favor of a cause of action based on assumpsit. *See, e.g., Stuart v. Wilkins*, 1 Dougl. 18, 99 Eng. Rep. 15 (K.B.1778). Thereafter, claims for breach of the express warranty by the manufacturer's representation became the sole cognizable claim for product misrepresentations. Because this contractual cause of action required privity between the parties to the contract of sale, however, suits between the consumer and the manufacturer were uniformly dismissed. *See, e.g., Senter v. B.F. Goodrich Co.*, 127 F.Supp. 705 (D.Colo.1954); *Barnie v. Kutner*, 45 Del. 550, 76 A.2d 801 (1950); *Pearl v. William Filene's Sons Co.*, 317 Mass. 529, 58 N.E.2d 825 (1945); *Turner v. Edison Storage Battery Co.*, 248 N.Y. 73, 161 N.E. 423 (1928).

As the law continued to evolve, the courts increasingly rejected the necessity for a contractual relationship, recognizing that the ultimate consumer, in purchasing a product, often relied heavily upon the manufacturer's express public representations

---

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
The applicability of section 402A to products liability cases has since been well established in this state. *See, e.g., Anderson v. Heron Engineering Company, Inc.*, 198 Colo. 391, 604 P.2d 674 (1979); *Union Supply v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978); *Bonfils Blood Bank v. Hansen*, 195 Colo. 529, 579 P.2d 1158 (1978); *Potthoff v. Alms*, 41 Colo.App. 51, 583 P.2d 309 (1978).

of the qualities and character of the product. In *Baxter v. Ford Motor Co.*, 168 Wash. 456, 12 P.2d 409, *on second appeal*, 179 Wash. 123, 35 P.2d 1090 (1934), the court used the concept of misrepresentation to conclude that a manufacturer who innocently misrepresented a material fact concerning a product, which was relied upon by the purchaser, was strictly liable for injuries caused by the failure of the product to conform to the represented facts. Moreover, the modern approach to merchandising precipitated a judicial rejection of the contractual trappings of express warranty and a recharacterization of a publicly communicated innocent misrepresentation as tortious in nature. *See, e.g., Randy Knitwear, Inc. v. American Cyanamid Co.*, 11 N.Y.2d 5, 181 N.E.2d 399, 226 N.Y.S.2d 363 (1962); *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 147 N.E.2d 612 (1958). Using this theory, the court in *Randy Knitwear* imposed strict liability on the manufacturer for material public representations which were relied upon by the ultimate consumer and which were subsequently proved to be false:

> "The world of merchandising is, in brief, no longer a world of direct contract; it is rather, a world of advertising and, when representations expressed and disseminated in the mass communications media and on labels (attached to the good themselves) prove false and the user or consumer is damaged by reason of his reliance on those representations, it is difficult to justify the manufacturer's denial of liability on the sole ground of absence of technical privity. Manufacturers make extensive use of newspapers, periodicals and other media to call attention, in glowing terms, to the qualities and virtues of their products, and this advertising is directed at the ultimate consumer or at some manufacturer or supplier who is not in privity with them. Equally sanguine representations on packages and labels frequently accompany the article throughout its journey to the ultimate consumer and, as intended, are relied upon by remote purchasers. Under these circumstances, it is highly unrealistic to limit a purchaser's protection to warranties made directly to him by his immediate seller. The protection he really needs is against the manufacturer whose published representations caused him to make the purchase." *Id.* 226 N.Y.S.2d at 367, 181 N.E.2d at 402.

The ultimate result of judicial rejection of the orthodox rule of contractual privity and recognition of a theory of strict tort liability for innocent misrepresentations by a manufacturer was the adoption of section 402B in the Restatement (Second) of Torts by the American Law Institute. Several jurisdictions have since expressly adopted the theory of section 402B. *See, e.g., Klages v. General Ordnance Equipment Corp.*, 240 Pa.Super.Ct. 356, 367 A.2d 304 (1976); *Hauter v. Zogarts*, 14 Cal.3d 104, 534 P.2d 377, 120 Cal.Rptr. 681 (1975); *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429 (Tex.1974); *Ford Motor Co. v. Lonon*, 217 Tenn. 400, 398 S.W.2d 240 (1966). *See generally W. Prosser, Torts*, § 97 (1975).

### C.

We agree that it is sound policy to permit a consumer, who purchases a product on the strength of the manufacturer's representations, to obtain direct recovery from the manufacturer on a theory of strict liability. In our view, the rationale behind such a policy is most persuasive in our complex society where manufacturers offer apparently similar but, in reality, fundamentally different products. It is the manufacturer who, through the design and testing of his products, knows of their particular qualities and capabilities. A consumer, on the other hand, knows only the information he has been able to glean from the manufacturer's marketing materials. Because of his superior knowledge, the manufacturer should not be permitted to avoid responsibility for his misrepresentations to the consumer, even though the misrepresentations were neither fraudulently nor negligently made.

Further, imposing strict liability on manufacturers who misrepresent their products does not impose an undue burden. A man-

ufacturer intends to reap economic benefit from the public representations it makes regarding the character and quality of its products, and must assume the economic consequences for physical harm resulting from misrepresentations it has made about its products. Manufacturers should not benefit economically from representations they make to the public and, at the same time, be insulated from liability for misrepresentations which result in physical harm.

We do not agree with petitioner's contention that adoption of a theory of strict liability in Colorado for product misrepresentation is superfluous in light of the applicable provisions of Colorado's express warranty statute. Sections 4–2–313 and 318, C.R.S.1973. An express warranty action involves elements of proof different from those required in a strict liability action for product misrepresentation. Specifically, section 4–2–313 provides that a seller creates express warranties by "[a]ny affirmation of fact or promise" or by "[a]ny description of the goods." Section 402B, on the other hand, provides that the misrepresentation must be of a "material fact concerning the character or quality" of the product and that the consumer must have justifiably relied upon the misrepresentation. An action based upon an express warranty, while not requiring contractual privity in this state, involves a distinctly different theory of recovery from that provided in a strict liability action for product misrepresentation. Comment d to section 402B provides:

"The liability in this Section is liability in tort, and not in contract; and if it is to be

called one of 'warranty,' it is at least a different kind of warranty from that involved in the ordinary sale of goods from the immediate seller to the immediate buyer, and is subject to different rules."

Although the elimination of the privity requirement in section 4–2–318, C.R.S.1973, allows the buyer to sue the manufacturer directly on the basis of a warranty tied to misrepresentation of a product, there is no rationale for not recognizing a similar cause of action in tort. *See Klages v. General Ordnance Equipment Corp.*, 240 Pa.Super.Ct. 356, 367 A.2d 304 (1976). *Accord, Hauter v. Zogarts*, 14 Cal.3d 104, 534 P.2d 377, 120 Cal.Rptr. 681 (1975) (recognizing that the express warranty provisions in the Uniform Commercial Code provide even greater coverage than section 402B allows). Therefore, when a product fails to perform to the level or in the manner that a consumer had been led to believe it would by the express representations of the manufacturer, we see no sound reason to preclude a separate and distinct strict liability action, under section 402B, against the manufacturer for the resulting physical harm to the consumer.[2]

### III.

We next address the issue of whether Winkler established a prima facie case for recovery under a theory of strict liability for product misrepresentation, thereby warranting the submission of his section 402B claim to the jury. Strict tort liability for misrepresentation does not impose an insurer status upon the manufac-

2. Although we have not heretofore considered the applicability of section 402B to products liability actions in Colorado, federal courts, when applying Colorado law, have found section 402B consistent with Colorado law and have permitted recovery against manufacturers under the provision. *See Westric Battery Co. v. Standard Electric Co. Inc.*, 482 F.2d 1307 (10th Cir. 1973). We need not, however, address the applicability of the Colorado Products Liability Act to a strict liability action under Section 402B since it was enacted after the cause of action arose in this case. Section 13–21–402(1), C.R.S.1973 (1980 Supp.) provides:

"No product liability action based on the doctrine of strict liability in tort shall be commenced or maintained against any seller of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user, or consumer unless said seller is also the manufacturer of said product or the manufacturer of the part thereof claimed to be defective. Nothing in this part 4 shall be construed to limit any other action from being brought against any seller of a product."

turer. Therefore, to establish a prima facie case for a strict liability action under section 402B, as adopted in this state, three major requirements must be met: (1) there must be a misrepresentation of a material fact concerning the character or quality of a chattel; (2) the misrepresentation must be made to the public; and (3) physical harm must have resulted to a consumer from justifiable reliance upon the misrepresentation. Even assuming arguendo that a material misrepresentation was made to the public by the illustrations on the helmet box which depicted a motorcyclist wearing a helmet,[3] the record in this case fails to establish that Winkler justifiably relied upon whatever representation was made. Accordingly, we conclude that Winkler did not establish a prima facie case for recovery under section 402B.

■ Justifiable reliance upon a misrepresentation constitutes a critical requirement for strict liability under section 402B. Unless the misrepresentation of a particular fact reasonably influences the purchase or use of the product, liability cannot be imposed upon its maker. Comment j to section 402B declares:

> "The rule here stated applies only where there is justifiable reliance upon the misrepresentation of the seller, and physical harm results because of such reliance, and because of the fact which is misrepresented. It does not apply where the misrepresentation is not known, or there is indifference to it, and it does not influence the purchase or subsequent conduct. At the same time, however, the misrepresentation need not be the sole inducement to purchase, or to use the chattel, and it is sufficient that it has been a substantial factor in that inducement." *Restatement (Second) Torts* § 402B, Comment j, at 362 (1965).

In considering whether justifiable reliance existed, the reasonable objective belief of the purchaser or user is determinative. *See Grinnell v. Charles Pfizer & Co.*, 274 Cal. App.2d 424, 79 Cal.Rptr. 369 (1969); *Arrow Transportation Co. v. A.O. Smith Co.*, 75 Wash.2d 843, 454 P.2d 387 (1969). In this regard, a purchaser's or user's actual knowledge of the quality or condition of a product, even though contrary to the representations of the seller, totally nullifies any justifiable reliance. *Harris v. Belton*, 258 Cal.App.2d 565, 65 Cal.Rptr. 808 (1968). *See* Sales, *The Innocent Misrepresentation Doctrine: Strict Tort Liability Under Section 402B*, 16 Houston L.Rev. 239, 261. *See also Arrow Transportation Co. v. A.O. Smith Co., supra.*

Under the facts of this case, we find no evidence of justifiable reliance by Winkler upon any misrepresentation by American sufficient to establish a prima facie case under section 402B. Winkler contends that he relied upon the illustration on the box he received with the helmet issued to him at the police academy in 1971 as a basis for using the "discarded" model # 1601 helmet for use while riding his dirt bike in 1975. In our view, such a claim is without merit. Winkler had previously received instructions on the proper use of model # 1601 helmet when he received training in riot control at the police academy in 1971:

COUNSEL: "Do you have training in riot control?"

WINKLER: "Yes."

COUNSEL: "Okay. And is that when they issued the helmet...?"

WINKLER: "Yes, that would be the helmet."

    \*    \*    \*    \*    \*    \*

COUNSEL: "Did you get any instruction in the police academy or on-the-job instruction on the use of that helmet?"

WINKLER: "Well, I believe we would have."

---

**3.** Because of our resolution of the issues regarding justifiable reliance, we do not find it necessary to address the issue of whether, under the facts of this case, the illustrations on the helmet box were misrepresentations of a material fact to the public. *See Restatement (Second) Torts* § 402B, Comments g and h, at

361 (1965). For the same reason, we decline to consider the issue of whether the facts of this case establish that Winkler was a "consumer" entitled to the protections of section 402B as adopted in this state. *See Restatement (Second) Torts* § 402B, Comment i, at 362 (1965).

During the time that Winkler was an officer in the Denver Police Department, model # 1601 helmets were issued only for use by general duty officers. In order that the two models could be readily distinguished, the general duty helmets were painted blue and the motorcycle helmets were painted white. Winkler was aware of this distinction and knew that the blue general duty helmets were not used by solo motorcycle officers. When Winkler chose the discarded model # 1601 helmet from the discard bin in the police warehouse, he chose a blue general duty helmet and thereafter painted it white. Moreover, the used model # 1601 helmets in the discard bin were not in the boxes supplied by the manufacturer.

Justifiable reliance contemplates the reasonable exercise of knowledge and intelligence in assessing the represented facts. Unsupportable subjective reliance is inadequate. In our view, Winkler did not establish that he justifiably relied upon any misrepresentation by American when he put the model # 1601 helmet to use while riding his motorcycle.

Therefore, we conclude that Winkler did not establish a prima facie case for recovery under a theory of strict liability for product misrepresentation, thereby warranting the submission of his section 402B claim to the jury. Because of our decision, we need not address Winkler's contention that the instructions given to the jury regarding proximate cause were improper.

Accordingly, we reverse the decision of the court of appeals and remand with directions to reinstate the judgment of the district court in favor of American Safety Equipment Corporation.

DUBOFSKY, LOHR and QUINN, JJ., dissent.

LOHR, Justice, dissenting:

I respectfully dissent. I agree with Justice Quinn's dissenting opinion except for his expressed differences with the majority as to the standard for justifiable reliance in a claim under § 402B of the *Restatement*

*(Second) of Torts.* In my opinion the majority sets forth the correct standard but does not apply it properly to the facts of this case.

The majority states that "[j]ustifiable reliance contemplates the reasonable exercise of knowledge and intelligence in assessing the represented facts." Contrary to Justice Quinn's views, this test imposes no duty of investigation upon a claimant. As I understand the majority's statement, it means no more than that it is not justifiable for a person to rely on a representation which he knows to be untrue or, through exercise of his knowledge and intelligence, could not reasonably believe to be true. This is eminently sound. If the drafters of the *Restatement (Second) of Torts* meant anything to the contrary, I would not adopt their position as the law of this state.

As developed by part II of Justice Quinn's dissent, however, the justifiability of Winkler's reliance upon the manufacturer's representations here is properly a question for the jury, even under the standard for justifiable reliance properly adopted by the majority. There is nothing in the record which would have required the jury as factfinder to determine that Winkler knew or must reasonably have believed that any representation by American that the helmet was suitable for motorcycling use was untrue. The sparse and inconclusive record references which the majority quotes as to Winkler's training in the proper use of the helmet simply underscore this conclusion.

I would affirm the judgment of the Court of Appeals and remand the case for a new trial on Winkler's § 402B claim.

QUINN, Justice, dissenting:

I respectfully dissent. My disagreement with the majority is on two counts: (1) I believe the majority's interpretation of justifiable reliance imposes upon a § 402B claimant a standard of conduct not intended by the drafters of the Restatement; and (2) I also believe the evidence adduced in support of the § 402B claim of the respondent (plaintiff) was sufficient to submit the case to the jury on that theory of liability.

## I.

Although I agree that § 402B is a salutary rule which should be incorporated into the tort law of this state, in my view the majority's conclusion that the plaintiff failed to establish a prima facie case of justifiable reliance is based on a misapprehension of § 402B. In rejecting the plaintiff's § 402B claim, the majority states that "[u]nsupportable subjective reliance is inadequate" and posits as the appropriate standard the following: "Justifiable reliance contemplates the reasonable exercise of knowledge and intelligence in assessing the represented facts." This standard, however, requires a consumer to make a reasonable independent assessment of the contents of the representation and, in effect, imposes upon a consumer a duty far beyond anything contemplated by § 402B.[1]

Comment j to § 402B indicates that the issue of justifiable reliance should be determined in accordance with the rules stated in §§ 537–545A. For reliance to be justifiable the matter misrepresented must be material. *Restatement (Second) of Torts, supra,* § 538(1). The content of a misrepresentation is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Restatement (Second) of Torts, supra,* § 538(2)(a). Thus, the only standard of reasonableness applicable to the element of justifiable reliance under § 402B relates to the consumer's *attachment of importance* to the misrepresented fact, not to the consumer's *assessment of the contents* of the misrepresented fact. That the drafters of § 402B did not intend the element of justifiable reliance to require the consumer's reasonable exercise of knowledge and intelligence in assessing the represented facts is obvious from § 540. That section states that the

recipient of a misrepresentation of fact "is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Comment a to § 540 states that a failure to investigate is no defense even "when it could be made without any considerable trouble or expense."

The interpretation of justifiable reliance adopted by the majority imposes a standard of conduct on the consumer which has no place in the doctrine of strict liability for misrepresentation.

## II.

I also disagree with the majority's analysis of the evidence and its conclusion that the plaintiff failed to establish a prima facie case of strict liability under § 402B. In determining whether a prima facie case of liability has been established, the evidence must be viewed in a light most favorable to the plaintiff and all reasonable inferences must be drawn in his favor. *E.g., Gossard v. Watson,* 122 Colo. 271, 221 P.2d 353 (1950). When the evidence is so viewed, it is apparent that the plaintiff's § 402B claim should have been submitted to the jury.

There was sufficient evidence establishing the defendant-seller's misrepresentation of a material fact concerning the helmet. The carton in which the model 1601 helmets were originally packaged had two pictured illustrations, one on each side, depicting a motorcyclist wearing the helmet. Also shown on the outside of the carton were illustrations of persons using the helmet to drive an automobile and to operate a snowmobile. A slogan on the carton stated "Protection Thru Research." No warning was placed on the carton that helmet model 1601 could not be used for motorcycling purposes.[2] From the consumer's stand-

---

1. While Comment j of § 402B indicates that reliance is unjustified "where the misrepresentation is not known, or there is an indifference to it," ignorance of or indifference to a misrepresentation is qualitatively distinct from the duty of reasonable independent assessment imposed by the majority.

2. In addition to the illustration on the carton, one of the defendant's sales circulars stated that the helmet offered "proven impact protection from vehicle accidents ...." Although the plaintiff did not see the sales circular, and therefore did not rely on the circular in using the helmet, the contents of the circular do cor-

point, the only way to determine the particular model inside the carton was by the model number written on the exterior of the carton. However, the model number by itself offered no indication that the helmet could not be used for the purposes depicted on the carton.

Although not addressed by the majority, the evidence also established a prima facie case that the misrepresentation was to the public—that is, the likely users of the helmet. Comment h of § 402B makes clear that the misrepresentation may be made not only by a form of advertising directed towards the general public, such as newspapers and television, but also "by literature distributed to the public through dealers, by labels on products sold, or by leaflets accompanying it . . . ." A representation through a dealer in particular goods or a representation by means of a label or leaflet accompanying the chattel would be directed only to that limited portion of the public likely to use the chattel, rather than to the public at large. Thus, what is significant under § 402B is whether the representation was made to likely consumers of the product, even though those consumers may constitute only a limited and select component of the general public.[3] The defendant in this case sent sales literature to law enforcement agencies and to retail outlets through which the helmet could be purchased. The defendant's custodian of records testified that he had seen records of sales of both types of helmets to a Denver retail outlet with whom the Denver Police Department placed its order. Moreover, the illustrations on the outside of the carton were calculated to reach the consumers of both helmet models 1601 and 1602.

There was also sufficient evidence of justifiable reliance by the plaintiff on the defendant's representation that helmet model 1601 could be used for motorcycling. The plaintiff testified that when helmet model 1601 was issued to him in 1970, it was packaged in a carton which had a picture on the outside showing a motorcyclist wearing the helmet and also a slogan stating "Protection Thru Research." The plaintiff retained the helmet in his police locker and relied on the illustration on the carton in using the helmet for motorcycling. Such evidence, when appropriately viewed, is sufficient to permit a jury to conclude that the plaintiff justifiably relied on the defendant's representation because, as a reasonable man, he regarded the representation on the carton to be important in determining his decision to use helmet model 1601 for motorcycling purposes. See Restatement (Second) of Torts, supra, § 538, Comment d.

In concluding that the plaintiff failed to establish justifiable reliance the majority singles out the instruction received by the plaintiff on the use of helmet model 1601, particularly as related to riot control situations, as well as his knowledge that this helmet model was issued to general duty officers and not to motorcycle officers. However, the plaintiff's awareness of these matters is not the equivalent of actual knowledge of the unsuitability of helmet model 1601 for motorcycling purposes. Unless there is some duty on the part of the consumer to make a reasonable independent assessment of the representation—a duty expressly repudiated by § 540 of the Restatement—the extent of the plaintiff's knowledge of helmet model 1601, as disclosed by this record, is not sufficient as a matter of law to nullify his right to rely on the defendant's representation that the helmet could be used for motorcycling purposes.

Finally, although not addressed by the majority, there can be no doubt that the plaintiff was a consumer within the mean-

roborate to some degree the character of the representation on the carton.

**3.** A caveat to § 402B states that the American Law Institute expresses no opinion "as to whether the rule stated in this section may apply (1) where the representation is not made to the public but to an individual . . . ." Since I

believe the evidence, when properly viewed, establishes a prima facie case of misrepresentation to the public, I do not consider the issue whether the plaintiff should be entitled to recover on the basis of a nonpublic representation to him about the helmet.

ing of § 402B. " 'Consumer' is to be understood in the broad sense of one who makes use of a chattel in a manner which a purchaser may be expected to use it." *Restatement (Second) of Torts, supra*, § 402B, Comment i. It is certainly foreseeable that an officer of the police department, to which helmet model 1601 was sold, would use it for the purpose depicted on the sales carton.

It is only in the clearest of cases, where the facts are undisputed and reasonable persons may draw but one inference from the facts, that the issue is one of law for the court. *See Blount v. Romero*, 157 Colo. 130, 401 P.2d 611 (1965). Here, when the evidence is viewed in a light most favorable to the plaintiff and every legitimate inference is acknowledged in his favor, a prima facie case of strict liability under § 402B has been established. Therefore, I would affirm the judgment of the Court of Appeals and remand the case for a new trial on the plaintiff's § 402B claim.

I am authorized to say that Justice DUBOFSKY joins me in the dissent.